Filed 2/15/23  Boster Associates v. Dynamic Finance CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BOSTER ASSOCIATES LIMITED,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DYNAMIC FINANCE CORPORATION et al.,<br><br>        Defendants and Appellants. | B313729<br><br>(Los Angeles County Super. Ct. No. BC488552) |

APPEAL from orders of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Frandzel Robins Bloom & Csato, Thomas M. Robins III, Michael Gerard Fletcher, Brett L. McClure and Bruce D. Poltrock for Defendants and Appellants.

Mayer Brown, John Nadolenco, Michael F. Kerr, Andrew Demko and C. Mitchell Hendy for Plaintiff and Respondent.

This consolidated appeal concerns the trial court's denial of four special motions to strike filed pursuant to Code of Civil Procedure section 425.16.[1] The motions were filed by appellants Dynamic Finance Corporation (DFC), Angela Chen Sabella, Beresford Properties, LLC (Beresford) and Cambridge Financial of California, LLC (Cambridge) (collectively appellants), who are defendants in this action brought by respondent Boster Associates Limited (Boster or respondent) on Boster's claims of breach of contract, conversion, and interference with prospective economic advantage, among others.

Appellants' special motions to strike involve references in Boster's allegations to appellants' involvement in bankruptcy proceedings and, in the case of Beresford, involvement in a Riverside county tax sale. Because these proceedings were incidental to Boster's allegations, we find that the trial court properly denied the special motions to strike.

## BACKGROUND[2]
**The initial loan and participation agreement**

In early July 2000, DFC made an $18 million real property investment in Riverside County, California, by lending $18 million to Rancho California Country Club (RCCC). The loan was secured by parcels of real property in Riverside County, near Temecula.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise noted. A special motion to strike under section 425.16 is also referred to as an anti-SLAPP motion.

[2] As this matter comes to us at the pleading stage, all claimed facts set forth herein should be considered unproven allegations.

Approximately two weeks later, on July 19, 2000, DFC and Boster entered into the participation agreement (PA) pursuant to which Boster purchased a 99 percent interest in the $18 million RCCC loan.[3]  Boster paid $15,416,728.48 for its participation interest.  DFC's obligation to pay Boster its 99 percent share included any "proceeds of the collateral."  The PA allowed DFC to cross-collateralize other assets as security for the repayment plus interest of the RCCC loan.  The PA mandated that "whenever Lender receives . . . any payment of principal of, interest accrued on . . . or other fees with respect to, the Loan (whether voluntary, involuntary, by application of set-off or counterclaim, as proceeds of the collateral or otherwise), Lender shall . . . pay Participant

---

[3]     Boster and DFC were two of many companies owned or controlled by Chen Din-Hwa (Chen) during his lifetime.  Chen's two daughters are Vivien Chen (Vivien) and Sabella.  (*Boster Associates Ltd. v. Dynamic Finance Corp.* (Sept. 11, 2015, B252609, B254451) [nonpub. opn.].)  As the trial court pointed out in its written decision, the original complaint alleged that in December 2003 Chen made a gift of certain assets supposedly of equal value to his daughters, with Sabella owning indirectly DFC and Vivien owning indirectly Boster.  Chen retained ownership and control of Boster until November 2008, when a conservator was appointed to administer Chen's affairs.  Sabella is DFC's principal.  In 1985, Chen appointed Sabella president of DFC.  Beginning near the end of 2003, when Chen designated Sabella to receive his United States assets, Sabella became the controlling person of DFC with control of the trust that is the indirect 100 percent owner of DFC.  Thus, appellants DFC and Sabella assert that at the time of the initial loan and PA in this matter, Chen owned and controlled both Boster and DFC.

3

Share of such payment to Participant . . . ."[4]  The PA specified: "Lender will not, without the consent of Participant, agree to . . . release or subordinate all or any substantial portion of the collateral for any of the Loan . . . except in accordance with the terms of the Loan Agreement or the Loan Documents."

The PA also required DFC to "furnish an accounting to [Boster] as promptly as practicable following [Boster's] request therefor."

DFC paid Boster approximately $5.9 million in December 2001 under the PA, but made no further payments under the PA.  Boster's allegations describe numerous transactions in which DFC and its alleged coconspirators participated, involving the parcels of land that secured the RCCC loan.  Boster alleges that these transactions eliminated the collateral securing the RCCC loan and that, despite receiving proceeds from these transactions, DFC failed to share such proceeds with Boster, as required under the PA.

The disputed transactions are set forth in detail below.

**North Plaza**

In June 2000, as plans for the RCCC investment were underway, DFC obtained a deed of trust to real property owned by North Plaza LLC (North Plaza).  Boster alleges that North Plaza is under common management and/or ownership with RCCC.  The North Plaza deed of trust provided a portion of the security for the RCCC loan from its inception.  The North Plaza deed of trust was recorded in January 2001 in Riverside County.

---

[4]  DFC was defined as the "Lender" and Boster was defined as the "Participant."

4

In November 2002, DFC recorded a release of the North Plaza deed of trust. Boster alleges that Sabella and DFC did not inform Boster of this release, in violation of the PA agreement, and to which Boster did not agree.

In January 2004, DFC recorded a "correction" of the release, effectively reinstating the North Plaza deed of trust as security for the RCCC loan but only as to a smaller portion of the parcel (parcel 14). Boster asserts that this action negatively affected its loan priority. Boster also alleges that DFC increased its separate loans to North Plaza, thereby diluting Boster's security in the North Plaza deed. In November 2003, Sabella's mother purchased a 99 percent interest in DFC's senior, separate loans to North Plaza.[5]

In January 2004, the North Plaza project went into involuntary bankruptcy. DFC filed two proofs of claim in the North Plaza bankruptcy. One proof of claim solely evidenced the cross-collateralized portion of the RCCC loan secured by the junior North Plaza deed of trust on parcel 14 (claim 15). At the same time, DFC filed a separate proof of claim evidencing its direct, senior lien in the North Plaza bankruptcy for an amount that had grown to nearly $12.6 million (Claim 16).

In May 2005, pursuant to an order of the bankruptcy court, DFC received $10.5 million from the sale of the North Plaza property. The payment constituted a partial payment on DFC's senior lien, which did not involve Boster. DFC received no money

[5]    The proceeds of the purchase were wired to Rostack Investments, Inc., another company owned by Chen that was participating in DFC's direct loan to North Plaza. Sabella's mother purchased 100 percent of Rostack's 99 percent interest in DFC's senior North Plaza loan.

from the North Plaza bankruptcy estate for its junior lien on the North Plaza deed of trust for the lien on parcel 14 for the RCCC loan.

The proceeds from the $10.5 million payment were paid to Sabella's mother, with a small portion returned to DFC to reflect its 1 percent interest in the direct loans to North Plaza.[6]

**Vail Lake entities**

When Boster entered into the PA, part of the collateral securing the RCCC loan included a deed of trust on property owned by Vail Lake Rancho California (VLRC). Boster alleges that VLRC is affiliated by common management or ownership with RCCC.

On June 30, 2000, VLRC executed a deed of trust for the benefit of DFC on certain real property to provide security for the RCCC note. Boster alleges that over the following 14 years, DFC, working in conjunction with Beresford and Cambridge, conducted a series of transactions without Boster's consent that ultimately eliminated the entire security interest.

First, Boster alleges that appellants deprioritized the VLRC/RCCC security interest by making later loans to various related entities (collectively the Vail Lake entities). In September 2002, DFC and Sabella released the deed of trust on the VLRC property. Boster was not informed of the reconveyance and was not provided with proceeds of the collateral DFC and

---

[6] Appellants point out that the $10.5 million payment was made in 2005, at which time 99 percent was promptly directed to Mrs. Chen. The ultimate settlement with the bankruptcy trustee was six years later, in April 2011, pursuant to which it was confirmed that the 2005 payment would not be wholly or partially revoked by the bankruptcy court.

Sabella received from such release. DFC then loaned a total of $22 million to other Vail Lake entities—namely, Vail Lake USA (VLUSA) and Vail Lake Village and Resort (VLVR). DFC allegedly intended for these loans, which were recorded on July 23, 2002, to be senior to the RCCC Vail Lake loan involving Boster. DFC and Sabella never informed Boster of these actions, which were to Boster's detriment. After recording these senior liens on property owned by VLUSA and VLVR, on November 27, 2002, DFC recorded deeds of trust securing the RCCC Vail Lake loan on the VLUSA and VLVR properties. "DFC deliberately chose to subordinate the deed of trust securing the RCCC Note in which Boster had a 99% interest to the deed of trust for the $17 million VLUSA Note in which Boster had no interest by recording the former more than two months after the latter." Boster alleges that Sabella made other loans to VLUSA in 2002, which were recorded with priority over the lien securing the RCCC note.

After recording many liens on the VLUSA and VLVR properties, which diminished the priority of the lien securing the RCCC loan, in 2010, DFC, Sabella, and an entity known as Prudent Financial (Prudent) entered into an agreement with Cambridge for the purchase and sale of loans (APSL).[7] Pursuant to this transaction, DFC (through Prudent) and Sabella sold their own loans secured by the Vail Lake properties to Cambridge, who

---

[7] Boster alleges that Prudent's participation in the APSL was merely nominal. Boster alleges that Prudent was selling loans and related security interests that were previously held by DFC but transferred to Prudent—and when payment was made for those loans and security interest, the payment went to DFC, not Prudent. Sabella admits that Prudent was "an affiliate of DFC to which certain DFC loans had been assigned."

did not buy the RCCC loan, which was not included in the transaction. As a result, Sabella and DFC received approximately $36 million. Boster alleges that through this transaction, having previously subordinated the RCCC lien in violation of the PA, DFC and Sabella were able to sell their own security interests to Cambridge to Boster's detriment.

In 2012 and 2013, the Vail Lake entities and other related entities entered into chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of California (Vail Lake bankruptcy). Cambridge, Beresford, and a related entity known as XD Conejo Notes, LLC (XD Conejo) each filed proofs of claim against VLRC, VLUSA, and VLVR in the Vail Lake bankruptcy.[8]

In July 2014, Cambridge, Beresford and XD Conejo entered into a settlement agreement with the debtors of the Vail Lake bankruptcy, including VLRC, VLUSA, and VLVR, in which Cambridge, Beresford and XD Conejo agreed to release their claims in the Vail Lake bankruptcy in exchange for the debtors' agreement to sell the underlying real estate parcels to Cambridge, Beresford and XD Conejo. On the same day, Cambridge, Beresford and XD Conejo executed an agreement and escrow instructions with Rancho California Water District (RCWD) to sell the property to RCWD. Under that agreement,

---

[8] Boster alleges that Ian Robertson and Kenneth Kai Chang were the managing members of Cambridge, Beresford, and XD Conejo. Specifically, both Robertson and Chang are principals of Cambridge. Chang is a managing member of Beresford, and Robertson was a managing member of XD Conejo. Boster also alleges that Sabella and Chang have known each other since at least 2000.

8

Cambridge, Beresford and XD Conejo sold the Vail Lake parcels to RCWD for $49,770,000. Pursuant to the APSL, DCF and Sabella received approximately $36 million of the money from the sale of the property to RCWD. Boster was never informed of the APSL, the sale of the DFC/Sabella loans to Cambridge, or the Vail Lake bankruptcy. DFC never shared any of the proceeds it received with Boster. Boster alleges that DFC and Sabella orchestrated Cambridge's purchase of the DFC/Sabella loans as part of a scheme to release the Vail Lake deeds of trust that cross-collateralized Boster's interest and to personally profit from the sale of the underlying securing properties to RCWD. Boster's interest in the Vail Lake properties was entirely extinguished by this series of events, and Boster received nothing.

**Walker Basin**

The original RCCC note, executed in 2000 and in which Boster took a 99 percent interest, was expressly secured by a deed of trust on the land that RCCC intended to develop with that loan, known as the Walker Basin deed of trust.

In approximately 2012, the property tax on the real estate parcels encumbered by the Walker Basin deed of trust became delinquent. In February 2012, DFC received notice from the Riverside County Assessor's Office that the Walker Basin parcels would be sold at a March 20, 2012 county tax sale. Sabella and DFC informed Cambridge and Beresford of the tax sale. Neither DFC nor Sabella informed Boster about the tax sale, or took any action to protect the collateral.

On March 20, 2012, the Walker Basin parcels were sold in a Riverside county tax sale. The winning bidder was Beresford, which purchased the parcels for approximately $3,371,000. The

9

tax sale had the effect of extinguishing the Walker Basin deed of trust.

In March 2013, DFC submitted a claim to Riverside County for its excess proceeds on the Walker Basin tax sale. DFC never informed Boster of its application to Riverside County for excess proceeds, nor did it share in any proceeds recovered from such application, or any profits or interest from Beresford's possession and potential development of the property. Boster alleges that Sabella orchestrated Beresford's purchase of the Walker Basin parcels as part of a scheme to extinguish Boster's interest in the RCCC note and that Sabella oversaw the transaction knowing that it constituted a breach of DFC's obligations to Boster under the PA.

## Boster requests for information

Boster sent letters inquiring about the RCCC loan and collateral in 2009 and 2012. DFC never answered the letters and never informed Boster of the events described above that eradicated Boster's interest in the PA.


## PROCEDURAL HISTORY

### Pleadings

In July 2012, Boster filed a complaint against DFC for breach of contract, alleging that DFC breached the PA by failing to provide an accounting, as required under the PA, and failing to pay Boster monies owed to Boster under the agreement, including, without limitation, any consideration received by DFC for its assignment and release of the North Plaza deed of trust.

DFC answered and filed a cross-complaint against Boster and Vivien. Vivien brought a successful motion to quash service of summons (*Boster Associates Ltd. v. Dynamic Finance Corp.,*

10

*supra*, B252609, B254451), and Boster brought a successful anti-SLAPP motion striking the claims against it.

The first amended supplemental complaint (FASC) against DFC was filed in 2018 and asserted causes of action for breach of contract, breach of the covenant of good faith and fair dealing, conversion, and fraudulent concealment. The FASC added allegations concerning the Vail Lake entities.

Following extensive discovery disputes, Boster received a production of documents that allowed it to learn for the first time that the Walker Basin deed of trust had been released. Boster also asserts that through this document production it learned more details regarding Cambridge's and Beresford's involvement in the loss of the collateral securing Boster's loan.

By stipulation, Boster filed the operative second amended supplemental complaint (SASC) on January 25, 2021. The SASC added three new defendants: Sabella, Beresford, and Cambridge, and alleged six new causes of action for interference with prospective economic advantage, interference with contractual relations, civil conspiracy, aiding and abetting, and equitable mortgage against all four defendants.

**Anti-SLAPP motions**

In response to the SASC, the four appellants separately filed the four anti-SLAPP motions that are the subject of this appeal.

Boster filed a motion to strike DFC's anti-SLAPP motion as untimely, asserting that DFC's anti-SLAPP sought to strike allegations that were present in both the original complaint and the FASC. Boster did not contend that the portion of DFC's motion directed to the newly pled eighth cause of action was

11

untimely, and it addressed DFC's motion to strike portions of the eighth cause of action in its opposition.

Appellants' motions asserted that some of Boster's allegations arose from protected activity under the first prong of section 425.16. The four appellants challenged allegations surrounding different events. Only DFC and Sabella challenged allegations surrounding the North Plaza bankruptcy. All four appellants challenged allegations surrounding the Vail Lake bankruptcies. Only Beresford challenged the allegations surrounding the Walker Basin tax sale.

### DFC's anti-SLAPP motion

DFC's anti-SLAPP motion sought to strike the references in the SASC to actions surrounding the North Plaza and Vail Lake entity bankruptcies, as follows:

### "MOTION TO STRIKE NO. 1:

"¶ 5a, p. 2:9-16 (italicized portion only):

"Unbeknownst to Boster, starting in or around approximately 2002, Defendants colluded and conspired to release, extinguish, and subordinate the collateral securing the RCCC Note—including the Walker Basin Deed of Trust and other deeds of trust that DFC cross-collateralized as security—through a series of byzantine transactions: a. **The North Plaza Bankruptcy**. In 2000, DFC cross-collateralized a deed of trust known as the North Plaza Deed of Trust as security for the RCCC Note, and partially released it in 2002. *When the underlying debtor entered bankruptcy proceedings in 2004, DFC filed creditor*

12

*claims in 2005, ultimately receiving $10.5 million in settlement in 2010.*

"**MOTION TO STRIKE NO. 2:**

"¶ 32, p. 9:7-8:

"On or about January 27, 2005, DFC filed Claims in the North Plaza bankruptcy in a total amount exceeding $30 million.

"**MOTION TO STRIKE NO. 3:**

"¶ 33, p. 9:9-12:

"On May 3, 2005, and pursuant to an order of the bankruptcy court, North Plaza paid DFC $10,500,000, subject to subsequent disgorgement by DFC, that is, DFC might be required by the bankruptcy court to repay all or part of the $10,500,000 into North Plaza's bankruptcy estate.

"**MOTION TO STRIKE NO. 4:**

"¶ 35, p. 9:15-17:

"In 2010, DFC and the Trustee entered into settlement negotiations regarding outstanding disputes between DFC and the Trustee. In October, 2010, DFC and the Trustee reached a settlement subject to bankruptcy court approval.

"**MOTION TO STRIKE NO. 5:**

"¶ 36, p. 9:18-23, and Exhibit E:

"On December 30, 2010, DFC moved the bankruptcy court for its approval of the settlement and submitted in support thereof a declaration by its counsel Michael Gerard Fletcher attaching a copy

13

of the final execution version of the settlement agreement. A copy of Mr. Fletcher's declaration, including the settlement agreement attached thereto, is attached hereto as Exhibit E. The settlement agreement between DFC and the Trustee was approved by the bankruptcy court and became effective on April 1, 2011.

**"MOTION TO STRIKE NO. 6:**

"¶ 37, p. 9:24-28:

"Under the settlement, DFC was allowed to retain the $10,500,000 previously received from North Plaza such that those funds were no longer subject to total or partial disgorgement by DFC. DFC also received a general release of claims and other consideration for the settlement. In return, DFC, inter alia, assigned to the Trustee all of its interest under the North Plaza Deed of Trust. DFC did not pay any of this $10.5 million settlement to Boster.

**"MOTION TO STRIKE NO. 7:**

"¶ 38, p. 10:1-5:

"Boster did not consent to DFC's assignment of DFC's interests under the North Plaza Deed of Trust to the Trustee nor did DFC seek such consent or even inform Boster that it was intending to assign away collateral for the RCCC Note. This assignment of DFC's interests constituted a substantial release of the collateral for the RCCC Note and violated

14

Section 5(c)(4) of the Participation Agreement.

**"MOTION TO STRIKE NO. 8:**

"¶ 39, p. 10:6-11:

"The consideration DFC received for the assignment of the North Plaza Deed of Trust was 'proceeds of collateral' within the meaning of Section 4(a) of the Participation Agreement. DFC therefore owed Boster under Section 4(a) of the Participation Agreement Boster's Participant Share (99%) of the consideration received by DFC for the assignment of the North Plaza Deed of Trust. However, DFC did not pay Boster any part of the consideration DFC received for its assignment of the North Plaza Deed of Trust.

**"MOTION TO STRIKE NO. 9:**

"¶ 52, p. 14:13-22 (allegation as to the release of the amended VLUSA TD):

"DFC executed a Substitution of Trustee and Full Reconveyance of Deed of Trust dated as of August 4, 2014, the effect of which was to release the security for the RCCC Note provided by the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust. This Substitution of Trustee and Full Reconveyance of Deed of Trust was recorded on August 25, 2014 in the Riverside County, California official records as instrument No. 2014-322092. DFC did not notify Boster about this release of its security and Boster did not

15

consent thereto. This release of security was a substantial release of the collateral for the RCCC Note and violated Section 5(c)(4) of the Participation Agreement. DFC did not pay Boster any part of the consideration DFC received for releasing the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust.

**"MOTION TO STRIKE NO. 10:**

"¶ 53, p. 14:23–p. 15:1 (allegation as to the release of the amended VLUSA TD):

"The consideration DFC received for the release of the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust was 'proceeds of collateral' within the meaning of Section 4(a) of the Participation Agreement. DFC therefore owed Boster under Section 4(a) of the Participation Agreement Boster's Participant Share (99%) of the consideration received by DFC for the release of the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust. However, DFC did not pay Boster any part of the consideration it received for the release of the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust.

**"MOTION TO STRIKE NO. 11:**

"¶ 55, p. 15:5-9 (allegation as to the release of the amended VLUSA TD):

"Given her position, Sabella almost certainly orchestrated these transactions as part of a scheme to subordinate Boster's liens on the VLUSA and

16

Amended VLUSA Deeds of Trust to the liens securing the DFC/Sabella Loans, in which Boster had no participation interest. Sabella oversaw and approved these transactions knowing, as DFC's manager, that they constituted breaches of DFC's obligations under the Participation Agreement with Boster.

**"MOTION TO STRIKE NO. 12:**

"¶ 64, p. 16[:]25–p. 17:5 (allegation as to the release of the amended VLVR Deed TD):

"DFC executed a Substitution of Trustee and Full Reconveyance of Deed of Trust, dated as of August 4, 2014, the effect of which was to release the security for the RCCC Note provided by the VLVR Deed of Trust and the Amended VLVR Deed of Trust. This Substitution of Trustee and Full Reconveyance of Deed of Trust was recorded on August 25, 2014 in the Riverside County, California official records as instrument No. 2014-322093[.] DFC did not inform Boster about this release of its security and Boster did not consent thereto. This release of security was a substantial release of the collateral for the RCCC Note and violated Section 5(c)(4) of the Participation Agreement. DFC did not pay Boster any part of the consideration it received for releasing the VLVR Deed of Trust and the Amended VLVR Deed of Trust.

17

**"MOTION TO STRIKE NO. 13:**

"¶ 65, 17:6-15 (allegation as to the release of the amended VLVR TD):

> "The consideration DFC received for the release of the VLVR Deed of Trust and the Amended VLVR Deed of Trust was 'proceeds of collateral' within the meaning of Section 4(a) of the Participation Agreement. DFC therefore owed Boster under Section 4(a) of the Participation Agreement Boster's Participant Share (99%) of the consideration received by DFC for the release of the VLVR Deed of Trust and the Amended VLVR Deed of Trust. However, DFC did not pay Boster any part of the consideration DFC received for its release of the VLVR Deed of Trust and the Amended VLVR Deed of Trust. Boster is informed and believes that DFC and/or its affiliates later received substantial compensation for the $5 million VLVR Note and the $17 million VLUSA Note in the form of amounts received from Cambridge Financial and possibly others. Boster did not share in this compensation.

**"MOTION TO STRIKE NO. 14:**

"¶ 66, 17:16-20 (allegation as to the release of the amended VLVR TD):

> "Given her position, Sabella almost certainly orchestrated these transactions as part of a scheme to subordinate Boster's liens on the VLVR and Amended

18

VLVR Deeds of Trust to the liens securing the DFC/Sabella Loans, in which Boster had no participation interest. Sabella oversaw and approved these transactions knowing, as DFC's manager, that they constituted breaches of DFC's obligations under the Participation Agreement with Boster.

**"MOTION TO STRIKE NO. 15:**

"¶ 95, p. 23:20-21 (insofar as the paragraphs that are subject to Motion Nos. 1-14 are incorporated into this paragraph):

"95. Boster incorporates by reference the allegations of paragraphs 1 through 94, inclusive as set forth in full at this point.

**"MOTION TO STRIKE NO. 16:**

"A. ¶ 101, e. p. 24:28:

"e. releasing the security for the RCCC Note provided by the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust;

"B. ¶ 101, g. p. 25:4:

"g. releasing the security for the RCCC Note provided by the VLVR Deed of Trust and the Amended VLVR Deed of Trust;

**"MOTION TO STRIKE NO. 17:**

"A. ¶ 102, a. (2). p. 25:16:

"(2) the assignment of the North Plaza Deed of Trust,

"B. ¶ 102, a. (4). p. 25:17-18:

"(4) the release of the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust, and

"C. ¶ 102, a. (5). p. 25:18-19:

"(5) the release of the VLVR Deed of Trust and the Amended VLVR Deed of Trust.

"D. ¶ 102, b. p. 25:20-21:

"failing to pay to Boster any part of the $10.5 million consideration received by DFC for its assignment and release of the North Plaza Deed of Trust;

**"MOTION TO STRIKE NO. 18:**

"¶ 105, p. 26:13-14 (insofar as the paragraphs subject to Motions Nos. 1-17 are incorporated into this paragraph):

"Boster incorporates by reference the allegations of paragraphs 1 through 104, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 19:**

"¶ 108, p. 26:21-22 (insofar as the paragraphs that are subject to Motion Nos. 1-18 are incorporated into this paragraph):

"Boster incorporates by reference the allegations of paragraphs 1 through 107, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 20:**

"A. ¶ 111, c. p. 27:13-14:

> "assigning DFC's interest under the North Plaza Deed of Trust to a third party;

"B. ¶ 111, g. p. 27:21-22:

> "releasing the security for the RCCC provided by . . . the Amended VLUSA Deed of Trust.

"C. ¶ 111, h. p. 27:24:

> "releasing the security for the RCCC provided by . . . the Amended VLVR Deed of Trust

## "MOTION TO STRIKE NO. 21:

"¶ 113, p. 27-28–p. 28:1 (insofar as the paragraphs that are subject to Motion Nos. 1-20 are incorporated into this paragraph):

> "Boster incorporates by reference the allegations of paragraphs 1 through 112, inclusive, as though set forth in full at this point.

## "MOTION TO STRIKE NO. 22:

"¶ 146, p. 33:3-4 (insofar as the paragraphs that are subject to Motion Nos. 1-20 are incorporated into this paragraph)[:]

> "Boster incorporates by reference the allegations of paragraphs 1 through 145, inclusive, as though set forth in full at this point.

## "MOTION TO STRIKE NO. 23:

"A. ¶ 149 (introduction), p 32-20-22 [*sic*]:

> "DFC, Sabella, Beresford and Cambridge each committed wrongful acts pursuant

21

to that agreement and design by causing and pursuing the release, extinguishment, and subordination of the security for the RCCC Note to Boster's detriment. Specifically:

"B. ¶ 149, a. p. 33:25:

"By . . . assigning the North Plaza Deed of Trust to a third party,

"C. ¶ 149, a. p. 33:26:

"By . . . releasing . . . the Amended VLUSA Deed of Trust,

"D. ¶ 149, a. p. 33:27:

"By . . . releasing . . . the Amended VLVR Deed of Trust."  (Fn. omitted.)

### *Sabella's anti-SLAPP motion*

Sabella's anti-SLAPP motion sought to strike identical allegations as DCF's motion, but added a motion to strike No. 24 seeking to strike the allegation in Boster's ninth cause of action for aiding and abetting in paragraph 152, which stated, "Boster incorporates by reference the allegations of paragraphs 1 through 151, inclusive, as though set forth in full at this point."

### *Cambridge's anti-SLAPP motion*

Cambridge sought to strike the following allegations, which somewhat overlapped with the allegations that DFC and Sabella sought to strike:

**"MOTION TO STRIKE NO. 1:**

"¶ 5, p. 2:9-p. 3:3 (italicized portion only)

"5. Unbeknownst to Boster, starting in or around approximately 2002, Defendants colluded and conspired to release, extinguish, and subordinate the collateral

22

securing the RCCC Note—including the Walker Basin Deed of Trust and other deeds of trust that DFC cross collateralized as security—through a series of byzantine transactions:

"* * *

"c. **The Vail Lake Bankruptcy**. In 2010, Sabella and DFC, through a DFC sister company named Prudent Finance, LLC ('Prudent'), sold the DFC/Sabella Loans to Cambridge. When the corporations that held title to the real estate parcels securing those loans— which also secured Boster's interest by virtue of DFC's cross-collateralization— went into bankruptcy in 2012, *Cambridge filed and eventually settled its creditor claims against the corporations. Under the 2014 settlement agreement, Cambridge was able to purchase certain real estate parcels previously owned by debtors, and quickly sold those parcels to a local water district for $49.6 million*.

"**MOTION TO STRIKE NO. 2:**

"¶ 46, p. 13:4-6:

"46. Boster is informed and believes that DFC, Sabella and/or their affiliates later received substantial compensation from Cambridge and possibly others for the sale to those entities of the DFC/Sabella Loans. Boster did not share in any of this compensation.

"**MOTION TO STRIKE NO. 3:**

"¶ 54, p. 15:2-4:

"54. Boster is informed and believes that DFC and/or its affiliates later received substantial compensation for the $17 million VLUSA Note, in the form of amounts received from Cambridge Financial and possibly others. Boster did not share in this compensation.

**"MOTION TO STRIKE NO. 4:**

"¶ 65, p. 17:12-15:

"74. Boster is informed and believes that DFC and/or its affiliates later received substantial compensation for the $5 million VLVR Note, in the form of amounts received from Cambridge Financial and possibly others. Boster did not share in this compensation.

**"MOTION TO STRIKE NO. 5:**

"¶ 74, p. 19:26-28 (italicized portion only):

"74. *Cambridge,* Beresford, and related entity XD Conejo Notes, LLC ('XD Conejo'), a California limited liability company, each *filed Proofs of Claim against VLRC, VLUSA, and VLVR in the Vail Lake Bankruptcy.*

**"MOTION TO STRIKE NO. 6:**

"¶ 76, 20:7-12 and Exhibit G (italicized portion only):

"76. *On July 8, 2014, Cambridge*, Beresford, and XD Conejo *entered into a settlement agreement with the debtors of the Vail Lake Bankruptcy, including VLRC, VLUSA and VLVR, wherein Cambridge, Beresford, and XD Conejo*

24

*agreed to release their claims in the Vail Lake Bankruptcy. In exchange, the debtors agreed to sell, through a bankruptcy sale, the underlying real estate parcels securing the DFC/Sabella Loans (the 'Vail Lake Parcels') to Cambridge, Beresford, and XD Conejo. The settlement agreement is attached hereto as Exhibit G.*

"**MOTION TO STRIKE NO. 7:**

"¶ 77, p. 20:13-17 (italicized portion only):

"77. On the same day, July 8, 2014, *Cambridge*, Beresford, and XD Conejo *executed an Agreement and Escrow Instructions with the Rancho California Water District ('RCWD'), a California local independent special district. Under that agreement, Cambridge, Beresford, and XD Conejo sold the Vail Lake Parcels and related claims in the Vail Lake Bankruptcy to RCWD 17 for $49,770,000.00 USD.*

"**MOTION TO STRIKE NO. 8:**

"¶ 78, p. 20:18-24:

"78. Pursuant to the APSL [i.e., the Agreement for Purchase and Sale of Loans alleged at ¶¶ 67-72 SASC Exh. F], Cambridge made two payments to DFC/Sabella as follows: DFC received $28.88 million on August 26, 2014—as noted above it was DFC not Prudent who received the payment for the interests purportedly transferred by DFC to Prudent; Sabella received $7.4704 million

25

on October 26, 2014. This totaled to $36.3504 million.

**"MOTION TO STRIKE NO. 9:**

"¶ 95, p. 23:20-21 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-8 and to the extent same is incorporated by reference in subsequent paragraphs):

> "95. Boster incorporates by reference the allegations of paragraphs 1 through 94, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 10:**

"¶ 105, p. 26:13-14 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-8 and to the extent same is incorporated by reference in subsequent paragraphs):

> "105. Boster incorporates by reference the allegations of paragraphs 1 through 104, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 11:**

"¶ 108, p. 26:21-22 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-8 and to the extent same is incorporated by reference in subsequent paragraphs):

> "108. Boster incorporates by reference the allegations of paragraphs 1 through 107, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 12:**

"¶ 113, p. 27:28-p. 28:1 (to the extent same incorporates by reference the paragraphs subject to

26

Motion Nos. 1-8 and to the extent same is incorporated by reference in subsequent paragraphs):

> "113. Boster incorporates by reference the allegations of paragraphs 1 through 112, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 13:**

"¶ 120, p. 29:10-11 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-8 and to the extent same is incorporated by reference in subsequent paragraphs):

> "120. Boster incorporates by reference the allegations of paragraphs 1 through 119, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 14:**

"¶ 124, p. 29:26-p. 30:1 (italicized portion only):

> "124. *By* purchasing the DFC/Sabella Loans pursuant to the Cambridge Agreement [i.e., presumably the APSL], *pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, and selling the underlying Vail Lake Parcels to RCWD, Cambridge intentionally acted to disrupt Boster's economic relationship with DFC.*

**"MOTION TO STRIKE NO. 15:**

"¶ 129, p. 30:19-20 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-14 and to the extent same is incorporated by reference in subsequent paragraphs):

27

"129. Boster incorporates by reference the allegations of paragraphs 1 through 128, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 16:**

"¶ 133, p. 31:6-9 (italicized portion only):

"133. *By* purchasing the DFC/Sabella Loans pursuant to the Cambridge Agreement, *pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, and selling the underlying Vail Lake Parcels to RCWD, Cambridge negligently acted to disrupt Boster's economic relationship with DFC.*

**"MOTION TO STRIKE NO. 17:**

"¶ 137, p. 31:23-24 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-23 and to the extent same is incorporated by reference in subsequent paragraphs):

"137. Boster incorporates by reference the allegations of paragraphs 1 through 136, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 18:**

"¶ 141, p. 32:8-12 (italicized portion only):

"141. *By* purchasing the DFC/Sabella Loans pursuant to the Cambridge Agreement, *pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, and*

*selling the underlying Vail Lake Parcels to RCWD, Cambridge intentionally acted with a design to induce DFC's breach of the Participation Agreement and the disruption of DFC's and Boster's contractual relationship.*

**"MOTION TO STRIKE NO. 19:**

"¶ 146, p. 33:3-4 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-29 and to the extent same is incorporated by reference in subsequent paragraphs):

> "146. Boster incorporates by reference the allegations of paragraphs 1 through 145, inclusive, as though set forth in full at this point.

**"MOTION TO STRIKE NO. 20:**

"¶ 147, p. 33:5-14 (insofar as same references Cambridge and the matters stricken under Motion Nos. 1-19):

> "147. As a group, DFC, Beresford, and Cambridge agreed to a common plan and/or design devised by Sabella to deprive Boster of its rights under the Participation Agreement. Specifically, DFC, Sabella, Beresford and Cambridge colluded and conspired to recover proceeds of the collateral securing Boster's interest in the Participation Agreement without notifying Boster, obtaining its consent, or sharing the eventual payments it received—totaling at least in the tens of millions of dollars—with Boster. In short, DFC, Sabella, Beresford and Cambridge conspired and

29

colluded to pursue a major real estate development project in the Vail Lake/Walker Basin area in Temecula, California that was substantially and significantly funded by Boster's 99% participation in the RCCC Note, all the while preventing Boster from receiving any of the returns on its investment to which it was entitled under the Participation Agreement.

**"MOTION TO STRIKE NO. 21:**

"¶ 148, p 33:15-19 [*sic*] (insofar as same references Cambridge and the matters stricken under Motions Nos. 1-19):

"148. Thus, DFC, Sabella, Beresford and Cambridge agreed to a common plan and/or design to intentionally and/or negligently interfere with Boster's prospective economic advantage, intentionally interfere with Boster and DFC's contractual relations, and/or to fraudulently conceal DFC's release, extinguishment, or subordination of the security for the RCCC Note.

**"MOTION TO STRIKE NO. 22:**

"¶ 149c, p. 33:20-22 and p. 34:11-17 (italicized portion only):

"149c. *By* purchasing the DFC/Sabella Loans pursuant to the Cambridge Agreement, *pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, and selling the underlying Vail Lake Parcels*

30

*to RCWD, Cambridge intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and therefore committed wrongful acts pursuant to the agreement and design described above.*

### "MOTION TO STRIKE NO. 23:

"¶ 152, p. 35:6-7 (to the extent same incorporates by reference the paragraphs subject to Motion Nos. 1-22 and to the extent same is incorporated by reference in subsequent paragraphs):

> "152. Boster incorporates by reference the allegations of paragraphs 1 through 151, inclusive, as though set forth in full at this point.

### "MOTION TO STRIKE NO. 24:

"¶ 156, p. 35:21-24 (insofar as same is based on allegations subject to Motions Nos. 1-22):

> "156. As alleged herein, Cambridge intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations. Beresford and Sabella each knew of these wrongful and tortious acts by Cambridge, and substantially assisted and/or encouraged them.

31

**"MOTION TO STRIKE NO. 25:**

"A. ¶ 157a, p. 35:25-p. 36:3 (italicized portion only and insofar as same is based on allegations subject to Motions Nos. 1-24):

"a. Sabella orchestrated, and aided and abetted: (1) DFC's breach of the covenant of good faith and fair dealing, (2) DFC's conversion, (3) DFC's fraudulent concealment, (4) Beresford and *Cambridge's intentional interference with prospective economic advantage*, (5) Beresford and *Cambridge's negligent interference with prospective economic advantage*, and (6) Beresford and *Cambridge's intentional interference with contractual relations.*

"B. ¶ 157b, p. 36:4-8 (italicized portion only and insofar as same is based on allegations subject to Motions Nos. 1-24):

"b. Beresford aided and abetted: (1) DFC's breach of the covenant of good faith and fair dealing, (2) DFC's conversion, (3) DFC's fraudulent concealment, (4) Sabella and *Cambridge's intentional interference with prospective economic advantage*, (5) Sabella and *Cambridge's negligent interference with prospective economic advantage*, and (6) Sabella and *Cambridge's intentional interference with contractual relations.*

"C. ¶ 157c, p. 36:9-13 (insofar as same is based on allegations subject to Motions Nos. 1-24):

"c. Cambridge aided and abetted: (1) DFC's breach of the covenant of good

32

faith and fair dealing, (2) DFC's conversion, (3) DFC's fraudulent concealment, (4) Beresford and Sabella's intentional interference with prospective economic advantage, (5) Beresford and Sabella's negligent interference with prospective economic advantage, and (6) Beresford and Sabella's intentional interference with contractual relations."

### *Beresford's anti-SLAPP motion*

Beresford challenged similar allegations relating to Beresford's participation in the Vail Lake bankruptcy, and added challenges to the allegations surrounding Beresford's participation in the Walker Basin tax sale.[9]

---

[9] Beresford asserts that in suing Beresford regarding events surrounding the Vail Lake bankruptcies, Boster has sued the wrong entity. Beresford claims that a different entity, nonparty Beresford Development, LLC, was the entity involved in the purchase of the Vail Lake liens and the sale to RCWD. In its motion to strike, Beresford argued that it had standing to bring the motion, even though it was not the "Beresford" party that participated in the Vail Lake bankruptcies. Under the second prong of the anti-SLAPP test, Beresford argued that it was not the entity that committed the allegedly wrongful act of participating in the bankruptcy. In response, Boster asserts that it will propound discovery regarding the Beresford entities, and, if the facts warrant it, will in due course request that the pleadings be corrected according to proof. Boster notes that the SASC asserts that the entities involved with the Vail Lake properties were "developer and defendant Beresford Properties, LLC . . . and its affiliate Beresford Development, LLC, both California Corporations." Boster asserts that this possible

The following are the allegations Beresford sought to strike that did not overlap with Cambridge's:[10]

**"MOTION TO STRIKE NO. 5:**

> "¶ 83, p. 21:19-24:

>> "83. Upon information and belief, the property tax owned on the real estate parcels encumbered by the Walker Basin Deed of Trust (the 'Walker Basin Parcels') became delinquent in approximately 2012. In or around February 2012, DFC received notice from the Riverside County Assessor's Office that the Walker Basin Parcels would be sold at a March 20, 2012 county tax sale due to their tax delinquent status. Individuals acting on behalf of Sabella and DFC informed Beresford and Cambridge of the upcoming tax sale.

**"MOTION TO STRIKE NO. 6:**

> "¶ 85, 21:27-p. 28:2:

>> "85. On March 20, 2012, the Walker Basin Parcels were sold at the County of Riverside, Office of the Treasurer-Tax Collector's Sale of Tax Defaulted Property. The winning bidder on the Walker Basin Parcels was Beresford— which, upon information and belief,

---

pleading error does not justify granting an anti-SLAPP motion. We agree and decline to discuss this point further.

[10]    Beresford concedes that there were typographical errors in its motion where it sought to strike italicized portions of a paragraph where there were no italics.

purchased the Walker Basin Parcels for approximately $3,371,000 USD.

**"MOTION TO STRIKE NO. 7:**

"¶ 86, p. 22:3-67 (italicized portion only) [*sic*]:

"86. A May 8, 2000 appraisal of the same Walker Basin Parcels prepared for DFC valued the Walker Basin Parcels at $19,600,000 USD. Thus, the purchase price Beresford was able to obtain for the Walker Basin Parcels at the March 20, 2012 tax sale represented a significant discount on the value of the property.

**"MOTION TO STRIKE NO. 8:**

"¶ 87, p. 22:7-8:

"87. The tax sale had the effect of extinguishing the Walker Basin Deed of Trust—*i.e.*, Boster's lien on the Walker Basin Parcels.

**"MOTION TO STRIKE NO. 9:**

"¶ 89, p. 22:12-16 (italicized portion only) [*sic*]:

"89. Upon information and belief, Cambridge and Beresford knew at least as early as 2015 that the 2012 tax sale had the effect of extinguishing the Walker Basin Deed of Trust. Further, Boster believes and therefore alleges that Cambridge and Beresford knew at the time of the tax sale that the sale would extinguish the Walker Basin Deed of Trust and with it, Boster's lien on the Walker Basin Parcels.

**"MOTION TO STRIKE NO. 10:**

"¶ 90, p. 22: 17-23 (italicized portion only) [*sic*]:

"90. Upon information and belief, Beresford is still the current owner of the Walker Basin Parcels. In or around 2016, Beresford submitted a project proposal to the Riverside County Planning Department General Plan Advisory Committee to develop the Walker Basin Parcels, requesting, among other things, that the area be redesigned from 'Open Space' to 'Community Development,' and that the land use designation for at least some of the Walker Basin Parcels be changed from 'Recreation' to 'Commercial []Retail.' Upon information and belief, Beresford continues to pursue this development project on the Walker Basin Parcels. [¶] . . . [¶]

**"MOTION TO STRIKE NO.16:**

"¶ 125, p. 30:2-6:

"125. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford intentionally acted to disrupt Boster's economic relationship with DFC.

**"MOTION TO STRIKE NO.17:**

"¶ 125, p. 30:2-6:

36

"125. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford intentionally acted to disrupt Boster's economic relationship with DFC. [*Sic.*] [¶] . . . [¶]

## "**MOTION TO STRIKE NO. 19:**

"¶ 127, P. 30:9-12 (italicized portion only) [*sic*]:

"127. As a proximate result of Sabella, Cambridge and Beresford's actions described above, Boster suffered damages in an amount subject to proof at trial, insofar as the security for its interest in the Participation Agreement was released, extinguished or subordinated, and it never received payment stemming from these proceeds of collateral. [¶] . . . [¶]

## "**MOTION TO STRIKE NO. 21:**

"¶ 134, p 31:10-13 [*sic*]:

"134. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford negligently acted to disrupt Boster's economic relationship with DFC.

**"MOTION TO STRIKE NO. 22:**

"¶ 134. p 31:10-13 [*sic*]:

"134. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford negligently acted to disrupt Boster's economic relationship with DFC. [¶] . . . [¶]

**"MOTION TO STRIKE NO. 24:**

"¶ 142, P. 32:13-17 [*sic*]:

"142. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford intentionally acted with a design to induce DFC's breach of the Participation Agreement and the disruption of DFC's and Boster's contractual relationship.

**"MOTION TO STRIKE NO. 25:**

"¶ 142, P. 32:13-17 [*sic*]:

"142. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD,

38

and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford intentionally acted with a design to induce DFC's breach of the Participation Agreement and the disruption of DFC's and Boster's contractual relationship. [¶] . . . [¶]

**"MOTION TO STRIKE NO. 29:**

"¶ 149, p 33:20-p. 34:24 [*sic*]:

"149. DFC, Sabella, Beresford and Cambridge each committed wrongful acts pursuant to that agreement and design by causing and pursuing the release, extinguishment, and subordination of the security for the RCCC Note to Boster's detriment. Specifically:

"a. By allowing the Walker Basin Deed of Trust to be extinguished and released in a March 2012 tax sale, partially releasing and subordinating the North Plaza Deed of Trust, assigning the North Plaza Deed of Trust to a third party, releasing the VLRC Deed of Trust, releasing the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust, and releasing the VLVR Deed of Trust and the Amended VLVR Deed of Trust—all without once notifying Boster or obtaining its consent—DFC breached the Participation Agreement, breached the covenant of good faith and fair dealing, converted Boster's interest in the Participation Agreement, and fraudulently concealed these actions and their effects from Boster. Therefore, DFC

39

committed wrongful acts pursuant to the agreement and design described above.

"b. By orchestrating each of the other Defendants' roles in the APSL transaction and the Walker Basin Tax Sale, and by using the security for the RCCC Note provided by the VLUSA Deed of Trust, VLRC Deed of Trust, and VLVR Deed of Trust to provide security for the Sabella Loans in which Boster had no participation, Sabella intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and therefore committed wrongful acts pursuant to the agreement and design described above.

"c. By purchasing the DFC/Sabella Loans pursuant to the Cambridge Agreement, pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, and selling the underlying Vail Lake Parcels to RCWD, Cambridge intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and therefore committed wrongful acts pursuant to the agreement and design described above.

"d. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the

40

Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and therefore committed wrongful acts pursuant to the agreement and design described above.

**"MOTION TO STRIKE NO. 30:**

"¶ 149, p 33:20-p. 34:24 [*sic*]:

"149. DFC, Sabella, Beresford and Cambridge each committed wrongful acts pursuant to that agreement and design by causing and pursuing the release, extinguishment, and subordination of the security for the RCCC Note to Boster's detriment. Specifically:

"a. By allowing the Walker Basin Deed of Trust to be extinguished and released in a March 2012 tax sale, partially releasing and subordinating the North Plaza Deed of Trust, assigning the North Plaza Deed of Trust to a third party, releasing the VLRC Deed of Trust, releasing the VLUSA Deed of Trust and the Amended VLUSA Deed of Trust, and releasing the VLVR Deed of Trust and the Amended VLVR Deed of Trust—all without once notifying Boster or obtaining its consent—DFC breached the

41

Participation Agreement, breached the covenant of good faith and fair dealing, converted Boster's interest in the Participation Agreement, and fraudulently concealed these actions and their effects from Boster. Therefore, DFC committed wrongful acts pursuant to the agreement and design described above.

"b. By orchestrating each of the other Defendants' roles in the APSL transaction and the Walker Basin Tax Sale, and by using the security for the RCCC Note provided by the VLUSA Deed of Trust, VLRC Deed of Trust, and VLVR Deed of Trust to provide security for the Sabella Loans in which Boster had no participation, Sabella intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and therefore committed wrongful acts pursuant to the agreement and design described above.

"c. By purchasing the DFC/Sabella Loans pursuant to the Cambridge Agreement, pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, and selling the underlying Vail Lake Parcels to RCWD, Cambridge intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and

42

therefore committed wrongful acts pursuant to the agreement and design described above.

"d. By pursuing creditor claims against VLUSA, VLRC, and VLVR in the Vail Lake Bankruptcy, settling those claims in the Vail Lake Bankruptcy, selling the underlying Vail Lake Parcels to RCWD, and purchasing the Walker Basin Parcels at the March 20, 2012 Riverside County tax sale, Beresford intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations, and therefore committed wrongful acts pursuant to the agreement and design described above. [*Sic.*] [¶] . . . [¶]

## "**MOTION TO STRIKE NO. 32:**

"¶ 155, p. 35:17-20 (to the extent based on actions by Beresford in the Vail Lake Bankruptcy):

"• 155. As alleged herein, Beresford intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations. Sabella and Cambridge each knew of these wrongful and tortious acts by Beresford, and substantially assisted and/or encouraged them.

## "**MOTION TO STRIKE NO. 33:**

"¶ 155, p. 35:17-20 (to the extent based on actions by Beresford in the Vail Lake Bankruptcy):

43

"•155. As alleged herein, Beresford intentionally and/or negligently interfered with Boster's prospective economic advantage and intentionally interfered with Boster and DFC's contractual relations. Sabella and Cambridge each knew of these wrongful and tortious acts by Beresford, and substantially assisted and/or encouraged them. [*Sic.*] [¶] . . . [¶]

"**MOTION TO STRIKE NO. 36:**

"¶ 160, p. 36:21-22:

> "160. Boster incorporates by reference the allegations of paragraphs 1 through 159, inclusive, as though set forth in full at this point.

"**MOTION TO STRIKE NO. 37:**

"¶ 163, p. 37:1-5:

> "163. Thus, the RCCC Note, in conjunction with the Participation Agreement, indicate an intention on the part of Boster, DFC, and RCCC to make the underlying Walker Basin Parcels security for RCCC's debt under the RCCC Note *and* security for DFC's obligations under the Participation Agreement, creating an equitable lien upon the Walker Basin Parcels in Boster's favor.

"**MOTION TO STRIKE NO. 38:**

"¶ 164, p. 37:6-15:

> "164. In contravention of that intent, DFC, Sabella, Beresford and the principals of Cambridge agreed and conspired to allow the Walker Basin Parcels to be sold at the March 20, 2012

Riverside County tax sale due to their delinquent tax status so that Beresford could purchase the Parcels at a significant discount relative to their market value. Despite having actual knowledge of Boster's interest in the Walker Basin Parcels immediately prior to the tax sale, DFC never told Boster about the sale and in fact, knowingly allowed Boster's legal lien on the Parcels to be extinguished at the tax sale. Nor did DFC ever inform Boster about the tax sale after it had occurred—despite DFC's attempts to collect the excess proceeds of the sale from **Riverside County after Boster sent its second demand letter regarding the Participation Agreement and after the original complaint in this action was filed**.

"**MOTION TO STRIKE NO. 39:**

"¶ 165, p. -37:16-22 [*sic*]:

"165. In the years since Boster's legal lien on the Walker Basin Parcels was extinguished at the tax sale, Beresford has continued its efforts to build a major residential development at the site, applying for and receiving from the County of Riverside approval to develop multiple single-family lots on the approximately 70 acres of land that comprise the Walker Basin Parcels. Beresford, and upon information and belief, its business partners DFC, Sabella, and Cambridge, stand to substantially profit from the development

45

of the Walker Basin Parcels upon completion of the project."

Boster opposed the motions.

### *Trial court decision*

The trial court heard argument on the motions over the span of four days. All four motions were denied in their entirety.

As to DFC's anti-SLAPP motion, the trial court denied it as untimely. The court found that the allegations that DFC sought to strike were contained in previous iterations of the complaint, and counsel chose not to file an anti-SLAPP motion.

The court further found that appellants' motions were procedurally flawed. While the court agreed that *Baral v. Schnitt* (2016) 1 Cal.5th 376 (*Baral*) allows a party to move to strike parts of a count, it found that the *Baral* court also held that seeking to strike piecemeal allegations is only appropriate if such allegations "amount to a 'cause of action' in the sense that it is alleged to justify a remedy." (*Id.* at p. 395.) The trial court found that the description in *Baral* did not fit the allegations defendants sought to strike in their motions. The court found that the motions set forth an improper "'line item veto'" that was confusing and ambiguous.

The court found that the motions also failed substantively under the first prong of the anti-SLAPP analysis.[11] Appellants argued that they met the first prong of the anti-SLAPP analysis because respondent's allegations referred to matters that were before the bankruptcy court. However, the court found that respondent persuasively countered that argument by asserting

---

[11] The court applied a similar analysis as to each of the four motions to strike.

46

that the bankruptcies "were merely 'steps' or 'devices'" through which appellants "sought to accomplish an improper purpose." Further, respondent was not complaining about appellants' right to petition or engage in free speech, but the outcome of those proceedings. For example, "that DFC allocated a multimillion dollar payout in a particular way (North Plaza) and released Boster's security without Boster's knowledge (Vail Lake)."

Because appellants' motions failed on the first prong of the anti-SLAPP analysis, the court found it need not reach the second prong. However, as to DFC's and Sabella's motions, the court noted that if it were to reach the second prong of the analysis, it would find that respondent set forth a prima facie case sufficient to survive the second prong analysis.

**Appeals and consolidation**

On June 30, 2021, appellants filed four separate notices of appeal. On March 14, 2002, this court ordered the appeals consolidated.

## DISCUSSION
### I. Applicable law and standard of review
#### A. *General law*

Section 425.16 was enacted "to provide for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 315.) Subdivision (b)(1) of section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in

47

connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Determining whether section 425.16 bars a given cause of action requires a two-step analysis. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) First, the court must decide whether the party moving to strike a cause of action has made a threshold showing that the cause of action "aris[es] from any act . . . in furtherance of the [moving party's] right of petition or free speech." (§ 425.16, subd. (b)(1); see *Navellier, supra*, at p. 88.) "'A cause of action "arising from" [a] defendant's litigation activity may appropriately be the subject of a section 425.16 motion to strike.' [Citations.] 'Any act' includes communicative conduct such as the filing, funding, and prosecution of a civil action." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)

In determining whether the moving party has met its burden of establishing that the challenged allegations arise from protected activity, the court should "consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park v. Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) A claim may be stricken under section 425.16 "'only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'" (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1014 (*Bonni*).) "'Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.'" (*Id.* at p. 1012, quoting *Baral, supra*, 1

48

Cal.5th at p. 394.) "'If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute.'" (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594 (*Area 51*).)  Thus, "[i]t is insufficient for protected activity to be 'a step leading to some different act for which liability is asserted' . . . ." (*Wong v. Wong* (2019) 43 Cal.App.5th 358, 365 (*Wong*).)

Generally, claims arising from actions that were taken as part of, or related to, a bankruptcy proceeding may be stricken under the anti-SLAPP statute.  (*Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 765-766 (*Crossroads*).)  In *Crossroads*, the parties agreed that the plaintiffs' claims arose from the defendant's acts of failing to provide timely and accurate accounting requested through the bankruptcy proceeding; refusals to accept the plaintiff's tenders of the amount required to cure the default, where the tenders were also made in connection with an issue under consideration by the bankruptcy court; and statements made as part of an effort to settle the bankruptcy action.  (*Id.* at pp. 777-785.)  Thus, where actions taken as a part of a bankruptcy proceeding supply the elements of a plaintiff's claim, the claim arises from protected activity and is subject to being stricken under the anti-SLAPP provision.  (*Id.* at p. 781; see *Cheveldave v. Tri Palms Unified Owners Assn.* (2018) 27 Cal.App.5th 1202, 1208-1214 [complaint was based on protected activity where the act complained of was the act of entering into a settlement agreement].)

If the court finds that a defendant has made the requisite threshold showing that the claim is based on protected activity,

the burden then shifts to the plaintiff to demonstrate a "probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1); see *Navellier, supra*, 29 Cal.4th at p. 88.) In order to demonstrate a probability of prevailing, a party opposing a special motion to strike under section 425.16 """must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.""" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741.)

A trial court's order denying a motion under section 425.16 is reviewed de novo. (*Park, supra*, 2 Cal.5th at p. 1067.)

### B. *Law regarding mixed allegations*

It is the moving party's burden to establish that the challenged allegations or claims arise from protected activity in which the defendant has engaged. (*Bonni, supra*, 11 Cal.5th at p. 1009.) Where a complaint alleges both protected and unprotected conduct, the moving defendant must "identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them." (*Id.* at p. 1010.) The court should then "examine whether those acts are protected and supply the basis for any claims." (*Ibid.*)

Where allegations surrounding court proceedings are alleged as part of a larger plan to deprive a plaintiff of assets, they are not properly stricken under the anti-SLAPP statute. (*Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 869-870 (*Gaynor*).) In *Gaynor*, the plaintiffs, who were beneficiaries of a trust, alleged breach of fiduciary duty against a de facto trustee, claiming that the defendant took actions that would wrongfully benefit the senior beneficiaries of the trust to the detriment of

50

junior beneficiaries.  (*Id.* at p. 879.)  The plaintiffs alleged some wrongful acts that were clearly not protected under section 425.16, such as "unfair and self-serving income-distribution decisions, . . . improper transfer of . . . property . . . , [and] plan[ning] to alter the Trust provisions in a manner that would benefit only the senior beneficiaries." (*Gaynor*, at p. 879.) However, the defendant sought to strike paragraphs of the petition alleging that the trustees wasted assets on probate litigation.  (*Ibid.*)  The *Gaynor* court denied the defendant's special motion to strike, finding that "the allegation that Trust assets were improperly used on the probate litigation was not a separate legal claim, but merely reflected the manner in which the Cotrustees and [defendant] implemented their alleged wrongful plan to alter the trustee succession rules to favor their own interests." (*Ibid.*)

Thus, appellants' burden is to show that Boster's allegations concerning the bankruptcies (and tax sale) form the elements of the claims against them.  (*Crossroads, supra*, 13 Cal.App.5th at p. 781.)  Where such allegations merely form part of a larger plan to deprive the plaintiff of assets, they are not subject to being stricken under section 425.16.  (*Gaynor, supra*, 19 Cal.App.5th at pp. 879-880.)

We note, as Boster points out, that appellants make no effort to show that Boster's allegations form the elements of the causes of action alleged against them.  Appellants have not set forth the elements of the individual causes of action, nor attempted to explain how the allegations concerning the bankruptcies form the essential elements of these claims.  For this reason alone, appellants have failed to meet their burden under the first prong of section 425.16.  However, as set forth

51

below, we find that Boster's claims do not arise from appellants' actions in the bankruptcy proceedings, but instead, those allegations merely provide context for the greater scheme alleged. In the greater scheme alleged, Boster contends that appellants engaged in transactions both prior to and following the bankruptcies and tax sale, which were designed to evade Boster's claims as a creditor of DFC with a financial interest in the underlying properties.

## II.    Scope of review

DFC does not challenge the trial court's decision that DFC could not specially move to strike allegations from the causes of action that were previously pled against DFC. Generally, an anti-SLAPP motion must be brought within 60 days of service of the complaint. (§ 425.16, subd. (f).) Because Boster asserted most of its claims against DFC in previous iterations of the complaint, DFC's special motion to strike is untimely as to those claims. However, DFC argues that its motion timely attacked the claims incorporated into the newly pled eighth cause of action for civil conspiracy. A defendant may "attack newly pled legal claims, whether or not based on existing allegations of protected activity." (*Starview Property, LLC v. Lee* (2019) 41 Cal.App.5th 203, 212.) While Boster does not contest that DFC's motion to strike is timely as to the eighth cause of action, Boster argues that DFC cannot specially move to strike the allegations from the previously pleaded causes of action. Boster contends that we should consider DFC's arguments only as they pertain to the new factual allegations underpinning the eighth cause of action.

DFC points out that the eighth cause of action for civil conspiracy—a new cause of action alleged against all four appellants—contains a catch-all allegation stating, "Boster

52

incorporates by reference the allegations of paragraphs 1 through 145, inclusive, as though set forth in full at this point." Thus, DFC argues, the previously pled allegations were pled anew with this new cause of action added in the most recent iteration of the complaint. DFC argues that its motion was timely as to this cause of action, thus all of the allegations previously pled, and incorporated into this new cause of action, must be considered.

We find that we need not address the trial court's decision regarding timeliness as to DFC concerning the eighth cause of action because appellants' motions fail at the first prong of the anti-SLAPP analysis.

We therefore address all the contested allegations. We organize the analysis, as appellants have done, by the triggering event.[12]

---

[12] Appellants point out that the trial court also held that their motions were procedurally improper, as they challenged only "bits and pieces of various allegations" in the SASC. The court expressed confusion as to what exactly the appellants were seeking to strike, noting that the motions were "nonsensical and impossible to rule upon." Appellants argue that the trial court erred in denying the four motions on procedural grounds. While *Baral, supra*, 1 Cal.5th at page 395 permits a defendant to strike allegations of protected conduct within a certain cause of action, those allegations of protected activity must be *asserted as grounds for relief.* As set forth below in detail, the portions of the SASC that appellants sought to strike did not form the basis for any claim for relief, nor have appellants argued that they did. Therefore the court's dismissal of the motions as improper "line-item veto[s]" was not in error in the context of this case. However, we decline address the procedural issue further, and instead affirm the trial court based on appellants' failure to show

53

## III. The bankruptcies

### A. *North Plaza allegations*

The North Plaza allegations concern DFC and Sabella. The SASC alleges that, years before the North Plaza involuntary bankruptcy, DFC recorded a partial release of the North Plaza deed of trust which negated Boster's security interest, without informing Boster or sharing any proceeds of collateral obtained from the release. Subsequently, DFC recorded a correction of the partial release of the North Plaza deed of trust with respect to only a portion of this property—again without Boster's knowledge or consent. In addition, before the bankruptcy proceedings began, DFC and Sabella increased their direct loans to North Plaza that formed the basis for their claim 16 in the bankruptcy proceedings and took priority over Boster's interest.

Thus, Boster's claims against DFC and Sabella regarding the North Plaza deed of trust arise from appellants' actions to subordinate and deprioritize Boster's interest in the underlying property—in essence, their actions to avoid repaying Boster's investment. After DFC and Sabella allegedly began this scheme to ensure that Boster did not recoup on its investment, North Plaza was forced into involuntary bankruptcy. DFC filed claims and received $10.5 million pursuant to a settlement with the bankruptcy trustee. In return, DFC assigned to the trustee all of its interest under the North Plaza deed of trust. DFC did not pay any of the $10.5 million settlement to Boster.

Pursuant to these allegations, DFC's participation in the North Plaza bankruptcy *itself* is not the wrong complained of.

---

that the alleged protected activity at issue gave rise to any of Boster's claims for relief. (*Ibid.*)

Boster does not fault DFC for filing claims in the bankruptcy, nor for settling with the bankruptcy trustee. Instead, Boster's claims against DFC for breach of contract, breach of the covenant of good faith and fair dealing, conversion, fraudulent concealment, civil conspiracy, and equitable mortgage are based on appellants' acts of allegedly derogating Boster's interest in the collateral at issue, not informing Boster of the deprioritization of its collateral, and not paying Boster any portion of the proceeds appellants ultimately received. Thus, the allegations concerning the North Plaza bankruptcy are not properly stricken under section 425.16. (*Bonni, supra*, 11 Cal.5th at p. 1014 [allegations may be stricken "'only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted'"].)

*Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388 is instructive. In *Optional Capital*, the plaintiff (Optional) alleged a conspiracy among the defendants to take control of Optional and use their fiduciary positions to loot the company and manipulate its stock. (*Id.* at p. 1393.) Various legal proceedings commenced, and forfeiture proceedings led to the Swiss government freezing Optional's funds held in a Credit Suisse Bank in Geneva, Switzerland. (*Id.* at p. 1394.) The defendants filed an anti-SLAPP motion arguing that Optional's complaint for conversion and fraudulent conveyance arose from the settlement of litigation that resulted in the release of the funds from Credit Suisse Bank, and the settlement was protected activity within the meaning of section 425.16. (*Optional Capital*, at p. 1396.) The trial court agreed, but the *Optional Capital* court reversed, finding that Optional's claims did not arise from protected activity. (*Id.* at pp. 1398-1399.) The court explained:

"Here, Optional's complaint seeks to recover monies looted from it and wrongfully obtained by [defendants] from the Credit Suisse account. The only connection between the settlement in the . . . superior court litigation and Optional's claims here is that the settlement was used as a device to permit [defendants] to persuade the Swiss government to release the funds, thereby depriving Optional of funds to satisfy its judgment." (*Id.* at pp. 1400-1401.)

Similarly, here, Boster seeks to recover money owed to it through the PA, which, Boster claims, was wrongfully converted through the various transactions alleged. The North Plaza bankruptcy was a collateral event that occurred during the defendants' scheme, which allowed DFC and Sabella to receive money on subsequent loans they made in derogation of Boster's interest. However, DFC's acts of filing claims in the bankruptcy and settling with the bankruptcy trustee, do not form the basis of any of Boster's claims. Instead, DFC and Sabella's allegedly wrongful acts, including making senior loans, receiving money without compensating Boster under the PA, and failing to inform Boster of the events that derogated its interest—all of which were allegedly in breach of the PA—form the basis of Boster's claims.

*O&C Creditors Group, LLC v. Stephens & Stephens XII, LLC* (2019) 42 Cal.App.5th 546 (*O&C Creditors*) is distinguishable. *O&C Creditors* involved a settlement between certain lawyers and their insurance company in an insurance coverage dispute. The written settlement agreement "expressly determined the allocation of the settlement proceeds." (*Id.* at p. 555.) The trial court granted an anti-SLAPP motion in subsequent litigation that targeted two causes of action: "a claim for breach of trust against [the insurance company for] failing to

advise the bankruptcy court of the . . . settlement and 'secretly disbursing' the proceeds of the settlement" and a claim for interference with prospective business relations based on the same conduct. (*Id.* at p. 559.) Under these circumstances, the *O&C Creditors* court found that the challenged claims "'rely on' and arise from the allegedly wrongful acts of settling the case . . . and thereafter effectuating that settlement . . . in accordance with the protected agreement." (*Id.* at p. 573.) The *O&C Creditors* court thus agreed that "the challenged [claims] are founded upon and would not exist in absence of the protected settlement activity; the [claims] thus "'arise from'" and are "'based on'" the settlement agreement, making them subject to the provisions of the anti-SLAPP statute." (*Id.* at p. 567.)[13]

Here, in contrast, Boster's claims *would* exist in the absence of appellants' actions in the bankruptcy proceedings. Boster's allegations regarding appellants' alleged wrongful

---

[13] We reject appellants' argument that Boster's prong 1 arguments that the actions of appellants in the bankruptcies were wrongful is, in fact, a prong 2 argument going to the merits of Boster's causes of action. In support of this argument, appellants cite *O&C Creditors, supra*, 42 Cal.App.5th at page 574, which stated that "O&C Creditors' argument—that cross-defendants agreed to an improper settlement—goes to the merits and, thus, is "'an issue which [it] must raise and support in the context of the discharge of [its] burden to provide a prima facie showing of the merits of [its] case.'"" As set forth above, unlike in *O&C Creditors*, Boster's claims are not based on protected activity. Boster is not suing appellants for their act of settling with the bankruptcy trustee. Instead, Boster alleges appellants' actions in the bankruptcy proceedings were part of a larger scheme to deprive Boster of security interests. Thus, we do not reach prong 2 of the test.

57

actions begin years prior to the bankruptcy, when appellants released the collateral for Boster's loan, reinstated it years later as to only a small parcel of the property, and increased their separate loans in derogation of Boster's interest.  The actions appellants took in North Plaza's involuntary bankruptcy are not, alone, the basis for Boster's claims.  They were merely steps that appellants took to carry out the larger scheme to deprive Boster of money to which it was allegedly entitled.

"'[C]ollateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute.'" (*Area 51, supra*, 20 Cal.App.5th at p. 594.)  Appellants' alleged activity in the bankruptcy proceedings were merely "'step[s] leading to some different act for which liability is asserted.'" (*Wong, supra*, 43 Cal.App.5th at p. 365.)  As such, the anti-SLAPP motions brought concerning allegations surrounding the North Plaza bankruptcy were properly denied under the first prong of the anti-SLAPP analysis.

### B.  *Vail Lake allegations*

Appellants also assert that Boster asserted claims that were "inextricably tied" to DFC's actions in the Vail Lake bankruptcy.  Again, appellants do not make any effort to assert which specific elements of which specific causes of action these bankruptcy-related actions formed.  Instead, they argue generally that the August 2014 reconveyances of the VLUSA and VLVR liens were "part and parcel of DFC's acquiescence in the treatment of these liens as part of the claims process that led the August 8, 2014, bankruptcy court order . . . approving the sale of the Vail Lake properties secured by the DFC/Sabella loans, free and clear of all liens, including the Boster-claimed VLUSA and VLVR Junior Liens."  Appellants generally allege that all actions

58

supposedly causing injury to Boster occurred in the bankruptcy proceeding.

The allegations do not support appellants' vague assertion that the causes of action at issue arise from acts that took place in the context of the Vail Lake bankruptcy proceeding. As with the North Plaza bankruptcy, the Vail Lake bankruptcy was merely incidental to Boster's overall claims regarding appellants' scheme to undermine Boster's security interest in certain property. The SASC alleges that appellants accomplished this through a series of transactions, recordings, releases, and re-recordings—all without Boster's knowledge or consent—that ultimately eliminated the security interest entirely. DFC and Sabella sold their own loans to Cambridge, which allowed DFC and Sabella to receive compensation for their loans prior to the Vail Lake bankruptcy. DFC and Sabella did not include the loan in which Boster had an interest and did not inform Boster that DFC was receiving compensation for its other Vail Lake-related loans. The loan sale placed Cambridge in a position to ultimately own the Vail Lake properties free and clear of Boster's interest. This alleged series of transactions began well before the 2012 and 2013 Vail Lake bankruptcies.

On the same day that they entered a settlement agreement with the Vail Lake bankruptcy debtors to receive the underlying real estate parcels in exchange for a release of their claims, Cambridge and Beresford entered an agreement to sell the land to RCWD. The timing of the sale, following immediately after their acquisition of the land, suggests that it was deliberately planned as part of the alleged larger scheme to eliminate Boster's interest to the benefit of appellants. Following the sale,

59

Cambridge channeled the proceeds to DFC and Sabella. Boster received nothing.

The allegations surrounding appellants' actions in the Vail Lake bankruptcy do not form the basis of Boster's claims against appellants. None of appellants' actions in the bankruptcy proceedings "supply the elements" of any cause of action. (*Bonni, supra,* 11 Cal.5th at p. 1012.) Instead, the bankruptcy proceedings are "incidental background" that "merely provide context, without supporting a claim for recovery." (*Ibid.*) Thus, they are not properly stricken under the anti-SLAPP statute. (*Ibid.*)

**IV.    The tax sale**

Beresford seeks to strike the allegations concerning the Walker Basin tax sale. Beresford asserts that it has found no published case addressing whether a citizen's participation in a county's public sale of tax-defaulted real property is a protected activity under section 425.16. However, Beresford argues that participation in a tax sale should be considered protected activity. Beresford argues that bidding on a tax sale property is an act of free speech within the protection of the statute.

We find that we need not decide whether a tax sale constitutes protected activity because, even if it does, the allegations concerning Beresford's participation in the tax sale in this matter do not supply the elements of any of Boster's causes of action. Boster is not seeking to hold Beresford liable for its act of bidding at the tax sale. Instead, Beresford is alleged to have engaged in a course of conduct predating the tax sale that affected Boster's interest in the Walker Basin property.

The RCCC note—in which Boster took a 99 percent interest under the PA—was expressly secured, in part, by the Walker

60

Basin deed of trust. Although DFC received notice that the taxes were delinquent on the Walker Basin property and that the property would be sold at an upcoming county tax sale, DFC did not inform Boster nor make any effort to prevent the tax sale from occurring. Instead, DFC and Sabella informed Beresford and Cambridge of the upcoming tax sale, and Beresford purchased the property at a significant discount. It was not Beresford's purchase of the property at the tax sale that formed the basis of Boster's relevant causes of action, but the fact that through the acts of DFC, Sabella, and Beresford, Boster's lien on the Walker Basin property was extinguished. Further, no recovery of funds stemming from the Walker Basin deed of trust, the tax sale, or DFC's claim for excess proceeds, were ever shared with Boster. Through these collective actions, Boster alleges that DFC and Sabella orchestrated a scheme to deprive Boster of its interest in the RCCC note, with knowledge that such actions constituted a breach of DFC's obligations under the PA.

As with the bankruptcies, Beresford's participation in the tax sale does not form the basis of Boster's claims against Beresford. Instead, Beresford is alleged to have engaged in a course of conduct predating the tax sale that affected Boster's interest not only in the Walker Basin parcels but also in the Vail Lake properties. Together with DFC and Sabella, Beresford is alleged to have engaged in a comprehensive scheme to deprive Boster of its security interests in the various properties, including Walker Basin. Beresford is alleged to have known, before it bid, that the sale would result in the extinguishment of Boster's security interest in the Walker Basin property. According to the allegations, the decade-long scheme would have progressed even if the tax sale had not occurred.

61

Appellants have failed to demonstrate error in the trial court's determination that none of the causes of action raised in the four anti-SLAPP motions arise from protected activity. Because appellants have failed to meet their burden under the first prong of the anti-SLAPP analysis, we decline to address the second prong.

## DISPOSITION

The orders denying the special motions to strike are affirmed. Respondent is awarded its costs of appeal.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
BENKE, J.*

---

*       Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.